**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Tina M. Edmonson,                           :                    Case No. 1:12 CV 819

                                            :

        Plaintiff,                          :

                                            :

v.                                          :

                                            :

Commissioner of Social Security,            :            **REPORT AND**
        Defendant,                          :            **RECOMMENDATION**


## I. INTRODUCTION

Plaintiff Tina M. Edmonson ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g)

of Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying her

claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381

(Docket No. 1). Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15). For the reasons

that follow, the Magistrate recommends that the opinion of the Commissioner be affirmed.

## II. PROCEDURAL BACKGROUND

On February 23, 2009, Plaintiff filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 10, p. 113 of 826). On that same day, Plaintiff filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 (Docket No. 10, p. 120 of 826). In both applications, Plaintiff alleged a period of disability beginning January 2, 2008 (Docket No. 10, pp. 113, 120 of 826). Plaintiff's claims were denied initially on August 27, 2009 (Docket No. 10, pp. 59, 63 of 826), and upon reconsideration on January 8, 2010 (Docket No. 10, pp. 68, 70 of 826). Plaintiff thereafter filed a timely written request for a hearing on March 3, 2010 (Docket No. 10, p. 74 of 826).

On April 5, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Mike Dixon ("ALJ Dixon") (Docket No. 10, pp. 32-54 of 826). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 10, p. 32 of 826). ALJ Dixon found Plaintiff to have a severe combination of curvature of the spine and affective disorder with an onset date of January 2, 2008 (Docket No. 10, p. 20 of 826).

Despite these limitations, ALJ Dixon determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 10, p. 26 of 826). ALJ Dixon found Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following exceptions:

1.   Plaintiff cannot climb ladders, ropes, or scaffolds but can frequently climb ramps and stairs

2.   Plaintiff must avoid all exposure to hazards such as machinery and heights

3.   Plaintiff retains the ability to understand, remember, and follow multi-step instructions
4.   Plaintiff is able to attend to and persist to complete simple, repetitive tasks of a stable nature with no strict production demands (timed, counted, precision)

2

5.    Plaintiff is able to relate well to individuals but would do best in an environment with no groups for intense or prolonged periods

(Docket No. 10, p. 22 of 826). ALJ Dixon found Plaintiff able to perform her past relevant work as a housekeeper/cleaner and stocker (Docket No. 10, p. 26 of 826). Plaintiff's request for benefits was therefore denied (Docket No. 10, p. 26 of 826).

Plaintiff appealed ALJ Dixon's opinion to the Social Security Administration's Appeals Council (Docket No. 10, p. 5 of 826). Although it adopted the final decision of the ALJ, the Appeals Council found that Plaintiff was not capable of returning to her past work as a housekeeper/cleaner because that work did not satisfy the duration and substantial gainful activity requirements necessary to qualify as past relevant work (Docket No. 10, p. 10 of 826). Instead, the Appeals Council found Plaintiff capable of doing other work in the economy, including grocery bagger, industrial cleaner, and kitchen helper (Docket No. 10, p. 10 of 826). Therefore, Plaintiff's applications for benefits were denied (Docket No. 10, p. 12 of 826).

On April 5, 2012, Plaintiff filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of her denial of DIB and SSI (Docket No. 1). In her pleading, Plaintiff alleged that the ALJ failed to appropriately apply the treating physician rule (Docket No. 14, pp. 12-16 of 16). Defendant filed its Answer on July 2, 2012 (Docket No. 9).

### III. FACTUAL BACKGROUND

#### A.    THE ADMINISTRATIVE HEARING

An administrative hearing convened on April 5, 2011 (Docket No. 10, pp. 32-54 of 826). Plaintiff, represented by Katherine M. Braun, appeared and testified (Docket No. 10, p. 34 of 826). Also present and testifying was VE Kathleen L. Reis ("VE Reis")  (Docket No. 10, p. 32 of 826).

#### 1.    PLAINTIFF'S TESTIMONY

3

At the time of the hearing, Plaintiff was a thirty-two year old female with two children who lived alone (Docket No. 10, pp. 37, 39-40 of 826).[1] Plaintiff testified that she graduated from high school (Docket No. 10, p. 37 of 826). When asked, Plaintiff stated that her biggest obstacle in returning to work included a blood clot in her brain, which affects her balance and causes both sides of her body to tingle and go numb, transient ischemic attacks, mini strokes, and a heart condition (Docket No. 10, p. 38 of 826). Plaintiff indicated that she received public benefits in the amount of $115 per month, food stamps, and subsidized rent (Docket No. 10, p. 39 of 826).

Plaintiff gave testimony concerning a number of her alleged impairments, including her headaches, mini strokes, and depression (Docket No. 10, pp. 37-46 of 826). With regard to her headaches, Plaintiff stated that they occur at least once per day and last from one to four hours (Docket No. 10, p. 40 of 826). Plaintiff described the pain as pounding and severe, treatable only with Vicodin (Docket No. 10, p. 40 of 826). Once she takes the Vicodin, Plaintiff indicated that she must lay down and cannot do any household chores (Docket No. 10, p. 41 of 826). Plaintiff testified that the doctors attribute her headaches to the blood clot in her brain but have not recommended surgery (Docket No. 10, p. 41 of 826).

Plaintiff's mini strokes occur two to three times per week and cause her sides to go numb from her "toes to the top of [her] head" (Docket No. 10, p. 42 of 826). Plaintiff stated that an attack lasts between twenty and sixty minutes and she just has to sit down and let it "work its course" (Docket No. 10, p. 42 of 826). Plaintiff testified that her doctors have no idea why she is having these attacks and that she is not on medication to control the condition (Docket No. 10, pp. 42, 45 of 826).

With regard to her depression, Plaintiff stated that she was prescribed Cymbalta, which only

---

[1]As of April 2011, these children were living with Plaintiff's uncle (Docket No. 10, p. 40 of 826).

made her sleepy (Docket No. 10, pp. 42, 46 of 826). Plaintiff indicated that she was attending counseling sessions at one point but stopped going because she felt that the staff did not want to help her (Docket No. 10, pp. 42-43 of 826). When asked if the depression affects her daily activities, Plaintiff indicated that she is constantly tired and cannot even get dressed most days of the week (Docket No. 10, p. 43 of 826). Instead, Plaintiff just stays in her apartment and watches television or sleeps (Docket No. 10, p. 43 of 826). Plaintiff indicated a difficulty with staying focused that sometimes prevents her from watching a television show from start to finish (Docket No. 10, p. 43 of 826). Plaintiff stated that she occasionally cooks or does chores around the house but has no hobbies, interests, or social activities (Docket No. 10, pp. 43-44 of 826).

Plaintiff indicated that she leaves her house "maybe" once per week, but only to go to the store or to a doctor's appointment (Docket No. 10, p. 44 of 826). When she leaves her house she cannot go alone and always goes with her neighbor (Docket No. 10, p. 44 of 826). When asked, Plaintiff indicated that she knows how to drive but currently has a suspended license for failure to pay child support (Docket No. 10, p. 44 of 826). She can take public transportation, but not by herself (Docket No. 10, pp. 44-45 of 826). Plaintiff has difficulty handling stress and believes that this difficulty is what causes her headaches (Docket No. 10, p. 45 of 826). She also has difficulty being around a lot of people (Docket No. 10, p. 45 of 826).

### 2. VOCATIONAL EXPERT TESTIMONY

Having familiarized herself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a school cleaner as light and unskilled, a daycare assistant as medium and semi-skilled, a temporary worker as light and unskilled, a retail stock person as heavy and

semi-skilled, and a baker as light and skilled (Docket No. 10, p. 49 of 826).[2]

ALJ Dixon then posed the following hypothetical question:

Assume a hypothetical individual of the same age, work experience, and education as [Plaintiff] in the following . . . physical and mental residual functional capacities . . . The physical RFC is as follows: no exertional limitations; frequent climbing, ramps, stairs, but never ladders, ropes, or scaffolds; occasional balancing, frequent stooping, kneeling, crouching and crawling; no manipulative visual, communicative or environmental limitations except avoid all exposure to hazards such as machinery, heights, et cetera.

Then the mental RFC is as follows: the hypothetical individual retains the ability to understand, remember, and follow multi-step instructions, is able to attend and persist, do complete simple repetitive tasks of a stable nature with no strict production demands, that includes time, accounted or precision demands, able to relate well to individuals but would do best in an environment with no groups for intense or prolonged periods.

Would that hypothetical individual be able to perform any of the past relevant jobs you've described for [Plaintiff]?

(Docket No. 10, p. 50 of 826). Taking into account these limitations, the VE testified that such an individual would be able to perform the housekeeper and stocker jobs, but none of Plaintiff's other past relevant work (Docket No. 10, pp. 50-51 of 826). The VE stated that there was other work that the hypothetical person could perform, including: (1) grocery bagger, listed under DOT 920.687-014, for which there are 400,000 positions nationally and 15,000 in the State of Ohio; (2) industrial cleaner, listed under DOT 381.687-018, for which there are 1,000,000 positions nationally and 38,000 in the State of Ohio; and (3) kitchen helper, for which there are 190,000 positions nationally and 8,000 in the State of Ohio (Docket No. 10, p. 51 of 826).

During cross-examination, Plaintiff's counsel questioned whether "[i]f you added into the hypothetical that the individual would be off task [twenty] percent of the time, would that change your

_____

[2] The VE indicated that, based on the testimony she heard during the hearing, Plaintiff did not work as a baker long enough to learn the job in its entirety (Docket No. 10, p. 49 of 826).

answer?" (Docket No. 10, p. 52 of 826). Based on this additional limitation, VE Reis testified that the hypothetical claimant would not be able to perform any other work (Docket No. 10, p. 52 of 826). Counsel then questioned the VE about an acceptable rate of absenteeism for an unskilled position, to which the VE responded a half day per month (Docket No. 10, p. 52 of 826).

**B.    MEDICAL RECORDS**

**a.    PHYSICAL HEALTH ISSUES**

Plaintiff's medical records date back to June 29, 2007, when Plaintiff saw Dr. Liwanag Asuncion, MD ("Dr. Asuncion") complaining of long-time headaches (Docket No. 10, p. 822 of 826). A CT scan of Plaintiff's brain was negative and Plaintiff was started on Topamax and advised to stop smoking (Docket No. 10, p. 822 of 826). On February 12, 2008, Plaintiff returned to Dr. Asuncion still complaining of headaches which were now accompanied by numbness on the left side of her body (Docket No. 10, p. 823 of 826). Dr. Asuncion repeated the CT scan and discovered the development of a large invasion within Plaintiff's right anterior lip and caudate (Docket No. 10, p. 823 of 826). On February 15, 2008, Plaintiff underwent an MRI of her brain, which revealed several abnormalities including: (1) an abnormal signal in the centrum semiovale and basal ganglia of the right cerebral hemisphere; (2) an abnormal signal in the white matter at the coricomedullary junction of the right frontal lobe; and (3) some patchy enhancement associated with these lesions (Docket No. 10, p. 520 of 826).

On February 22, 2008, Plaintiff was referred to neurologist Dr. Darshan Mahajan ("Dr. Mahajan") (Docket No. 10, p. 289 of 826). Dr. Mahajan noted that Plaintiff was smoking one pack of cigarettes per day (Docket No. 10, p. 290 of 826). It was also noted that Plaintiff suffered from mild

7

kyphoscoliosis[3] (Docket No. 10, p. 291 of 826). On March 20, 2008, Plaintiff had a normal electroencephalogram ("EEG"), showing no epileptic discharges (Docket No. 10, p. 266 of 826). Plaintiff also underwent cardiac imaging which showed mild intimal thickening and stenosis of the internal carotic arteries bilaterally (Docket No. 10, p. 282 of 826).

On April 24, 2008, Plaintiff saw Dr. Geetha Mohan ("Dr. Mohan") complaining of recurrent numbness and tingling on the left side of her face along with left-sided headaches (Docket No. 10, p. 592 of 926). Dr. Mohan opted to proceed with a transesophageal electrocardiogram ("ECG") (Docket No. 10, p. 593 of 826). The scan revealed evidence of interatrial shunting, likely from a patent foramen ovale ("PFO")[4] (Docket No. 10, pp. 366, 482 of 826). On May 5, 2008, Plaintiff presented to the Community Regional Medical Center Emergency Room ("Community ER") complaining of chest pain, left-sided facial numbness, and arm tingling (Docket No. 10, p. 488 of 826). Plaintiff denied tobacco use during this visit (Docket No. 10, p. 488 of 826). Plaintiff was discharged with benign chest pain (Docket No. 10, p. 490 of 826). Plaintiff returned to Dr. Mohan on May 29, 2008, complaining of frequent spells of left-sided facial numbness and tingling (Docket No. 10, p. 590 of 826). Dr. Mohan noted that these spells were consistent with Transient Ischemic Attacks ("TIA")[5] (Docket No. 10, p. 590 of 826).

---

[3] Lateral curvature of the spine accompanying an anteroposterior hump. TABER'S CYCLOPEDIC MEDICAL DICTIONARY (2011).

[4] A condition in which the foramen ovale, an opening in the partition which separates the two upper chambers of the heart, fails to close after birth. The presence of this opening . . . allows a portion of the blood from the right atrium of the heart to bypass the lungs and flow directly into the left atrium. Such blood is deprived of its supply of oxygen, which it would normally receive while passing through the lungs. ATTORNEYS' DICTIONARY OF MEDICINE, 88151 (2009).

[5] A brief period during which the brain does not receive enough blood. It is manifested by a blurring of vision, slurring of speech, loss of orientation, numbness, etc. ATTORNEYS' DICTIONARY OF MEDICINE, 117546 (2009).

On July 30, 2008, Plaintiff saw Dr. Mahajan complaining of paresthesia, muscle contraction headaches, and kyphoscoliosis (Docket No. 10, p. 283 of 826). Plaintiff reported still having episodes of uncontrolled headaches and left-sided numbness (Docket No. 10, p. 283 of 826). Plaintiff also admitted to smoking one pack of cigarettes per day and was counseled on the need to quit (Docket No. 10, p. 284 of 826).

Plaintiff presented to the Community ER on February 3, 2009, complaining of a headache that had lasted for five days (Docket No. 10, p. 257 of 826). Plaintiff admitted that she had not taken her Depakote nor followed her aspirin regimen for several weeks (Docket No.10, pp. 255, 257 of 826). She was admitted for evaluation (Docket No. 10, p. 245 of 826). During her stay, Plaintiff underwent a psychiatric consultation and was diagnosed with major depressive disorder and started on Celexa (Docket No. 10, p. 254 of 826). She was discharged for outpatient followup on February 13, 2009 (Docket No. 10, pp. 245-46 of 826).

On March 11, 2009, Plaintiff underwent an abdominal stress test which revelaed mild mitral regurgitation and mild tricuspid regurgitation (Docket No. 10, p. 585 of 826). On March 17, 2009, a chest CT scan and a venous duplex sonography exam of the legs revealed normal results (Docket No. 10, pp. 302-04 of 826). Plaintiff also admitted to still smoking one pack of cigarettes per day (Docket No. 10, p. 580 of 826).

Plaintiff presented to the Community ER again on May 13, 2009, complaining of dizziness, light-headedness, and chest pain (Docket No. 10, p. 410 of 826). A chest CT scan was negative for any abnormality (Docket No. 10, p. 427 of 826). Plaintiff was diagnosed with unspecified chest pain and discharged (Docket No. 10, p. 415 of 826). Plaintiff was transported by ambulance to the Community ER on August 5, 2009, after complaining of numbness and tingling (Docket No. 10, p. 390 of 826).

9

Plaintiff admitted to smoking half a pack of cigarettes per day (Docket No. 10, pp. 390-91 of 826). She was diagnosed with atypical chest pain of unknown cause and discharged (Docket No. 10, p. 392 of 826).

On August 30, 2009, Plaintiff was admitted to the EMH Regional Medical Center ("EMH") complaining of abdominal pain, nausea, vomiting, and diarrhea, rating her pain at a level ten out of a possible ten (Docket No. 10, p. 629 of 826). A CT scan showed transmural inflammation of Plaintiff's ascending and transverse colon, but her colonoscopy was normal (Docket No. 10, pp. 635-36 of 826). Plaintiff was discharged on September 1, 2009, with mild active colitis (Docket No. 10, p. 637 of 826).

On January 16, 2010, Plaintiff was admitted to the hospital via the Community ER complaining of an intractable headache (Docket No. 10, p. 789 of 826). She admitted to discontinuing both her Topamax and aspirin as well as being inconsistent with her Depakote (Docket No. 10, p. 790 of 826). Plaintiff also admitted to smoking one pack of cigarettes per day (Docket No. 10, p. 793 of 826). A CT scan of her brain revealed asymmetric focal effacement on the left with no underlying mass (Docket No. 10, p. 795 of 826). An MRI showed stable areas of signal abnormality (Docket No. 10, p. 796 of 826). Plaintiff was diagnosed with a tension muscular headache and discharged on January 19, 2010 (Docket No. 10, p. 789 of 826). Plaintiff returned to the Community ER on February 18, 2010, complaining of a headache (Docket No. 10, p. 769 of 826). A CT scan showed no changes from her February 3, 2009, scan (Docket No. 10, pp. 767, 774 of 826). Plaintiff was discharged with an unspecified headache (Docket No. 10, p. 774 of 826).

Plaintiff returned to Dr. Asuncion on June 14, 2010 (Docket No. 10, p. 823 of 826). Dr. Asuncion's records indicate that this was the first time he had seen Plaintiff since February 2008 (Docket No. 10, p. 823 of 826). Plaintiff complained of heart palpitations and headaches (Docket No.

10

10, p. 823 of 826) and also indicated poor compliance with her prescribed treatment regimens due to financial concerns (Docket No. 10, p. 824 of 826).

On June 20, 2010, Plaintiff was transported via ambulance to the Community ER complaining of a migraine (Docket No. 10, p. 745 of 826). She was diagnosed with an unspecified headache (Docket No. 10, p. 748 of 826). Plaintiff returned to Dr. Asuncion on June 30, 2010, complaining of heart palpitations (Docket No. 10, p. 821 of 826). Dr. Asuncion noted a mild increase in premature atrial contractions (Docket No. 10, p. 821 of 826).

Plaintiff was again transported by ambulance to the Community ER on July 2, 2010, complaining of dizziness and pain in her right arm, leg, and head (Docket No. 10, p. 734 of 826). A brain scan revealed relative atrophy of the right cerebral hemisphere and localized small areas of encephalomalacia[6] (Docket No. 10, p. 738 of 826). Hospital staff determined that Plaintiff's symptoms appeared to be the result of a past small vessel, cortical, and basal ganglia episode (Docket No. 10, p. 738 of 826).

On July 27, 2010, Plaintiff saw Dr. Dhruv R. Patel, MD ("Dr. Patel") complaining of tension headaches (Docket No. 10, p. 816 of 826). Plaintiff indicated that she suffered approximately fifteen of these headaches per month (Docket No. 10, p. 816 of 826). Plaintiff admitted to smoking one pack of cigarettes per day (Docket No. 10, p. 817 of 826). Dr. Patel diagnosed Plaintiff with tension muscular headaches and kyphoscoliosis with paresthesia (Docket No. 10, p. 818 of 826). On July 31, 2010, Plaintiff went to the Community ER complaining of chest pain (Docket No. 10, p. 720 of 826). Plaintiff had a normal pulmonary exam and there was no sign of acute cardiopulmonary disease

---

[6] A softening of the brain, usually caused by a deficiency of blood in the affected part. ATTORNEYS' DICTIONARY OF MEDICINE, 39197 (2009).

(Docket No. 10, pp. 726, 728 of 826).

On September 20, 2010, Plaintiff saw Dr. Richard A. Krasuski, MD ("Dr. Krasuski") complaining of headaches (Docket No. 10, p. 807 of 826). Dr. Krasuski was not convinced Plaintiff showed any clear evidence of paradoxical embolic events and diagnosed Plaintiff with possible complex migraines with an aura (Docket No. 10, p. 807 of 826). Dr. Krasuski also noted that the benefits of closing Plaintiff's PFO did not outweigh the risks of the procedure (Docket No. 10, p. 807 of 826). Plaintiff was advised to continue with her daily aspirin regimen (Docket No. 10, p. 808 of 826).

Plaintiff returned to Dr. Asuncion on October 1, 2010, complaining of dizziness and TIA episodes (Docket No. 10, p. 824 of 826). On November 21, 2010, Plaintiff was transported via ambulance to the Community ER complaining of chest pain (Docket No. 10, pp. 705, 712 of 826). Her chest x-ray was normal and she was diagnosed with bronchitis (Docket No. 10, pp. 702, 713 of 826).

On January 20, 2011, Plaintiff returned to the Community ER complaining of blurred vision (Docket No. 10, p. 668 of 826). A brain CT was normal, except for the already diagnosed PFO (Docket No. 10, p. 683 of 826). On August 16, 2011, Plaintiff returned to Dr. Patel, who opined that Plaintiff was medically unable to work (Docket No. 10, p. 826 of 826).

    **b.**   **MENTAL HEALTH ISSUES**

Plaintiff was admitted to the Community Health Partners Behavioral Unit ("Behavioral Unit") on August 23, 2008, after trying to run out into the middle of the street (Docket No. 10, pp. 455, 469 of 826). Plaintiff stated that she was very depressed about losing her children (Docket No. 10, p. 455 of 826). She was diagnosed with major depression, recurrent, and was assigned a Global Assessment of

Functioning ("GAF") Score of 35[7] (Docket No. 10, p. 470 of 826). Plaintiff was stabilized and

discharged on August 27, 2008, with instructions to follow up at the Nord Center for mental health

treatment (Docket No. 10, p. 456 of 826).

Plaintiff was readmitted to the Behavioral Unit on September 1, 2008, for medication

readjustment (Docket No. 10, p. 429 of 826). Plaintiff admitted to mistakenly only taking half of her

prescribed dose of Depakote and subsequently becoming depressed (Docket No. 10, p. 429 of 826).

Plaintiff stated that she thought she needed to be on a different medication (Docket No. 10, p. 442 of

826). Plaintiff also admitted to never following up with the Nord Center for behavioral healthcare

(Docket No. 10, p. 442 of 826).

Plaintiff's subsequent records indicate seven visits to the Nord Center from April 13, 2009,

through June 18, 2009 (Docket No. 10, pp. 568-75 of 826). Plaintiff was educated about depression

(Docket No. 10, pp. 568, 575 of 826).

## C.    EVALUATIONS

### 1.    PSYCHOLOGICAL EVALUATION

On April 6, 2009, Plaintiff underwent a Psychological Evaluation with Dr. Ronald G. Smith,

Ph.D. ("Dr. Smith") at the request of the Bureau of Disability Determination ("BDD") (Docket No. 10,

pp. 532-536 of 826). During the evaluation, Plaintiff admitted to being depressed and displayed a fairly

flat affect (Docket No. 10, pp. 534-35 of 826). Dr. Smith opined that Plaintiff was not impaired in her

ability to relate to coworkers, supervisors, or the general public in work situations (Docket No. 10, p.

---

[7] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 35 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

13

536 of 826). However, Dr. Smith noted that Plaintiff's ability to understand, remember, and follow instructions as well as her ability to maintain attention, concentration, and persistence in the performance of routine tasks would be mildly to moderately impaired due to her depression (Docket No. 10, p. 536 of 826). Dr. Smith assessed Plaintiff's ability to withstand the stress and pressure associated with daily work activity as severely impaired due to her depression (Docket No. 10, p. 536 of 826). Plaintiff was given a GAF score of 52[8] (Docket No. 10, p. 536 of 826).

###    2.    ADULT DIAGNOSTIC ASSESSMENT

On April 13, 2009, Plaintiff underwent an Adult Diagnostic Assessment at the Nord Center (Docket No. 10, pp. 548-64 of 826). Plaintiff appeared unkempt and reported feeling depressed (Docket No. 10, pp. 548, 550, 555 of 826). Plaintiff noted that she had a history of learning difficulties (Docket No. 10, pp. 552, 558 of 826). She reported being homeless, living with a variety of family and friends (Docket No. 10, p. 550 of 826). She also indicated that she had recently relinquished custody of her two children to relatives (Docket No. 10, p. 550 of 826). Nord Center staff reported that Plaintiff was a weak historian with limited insight and a poor understanding of her physical conditions and concerns (Docket No. 10, pp. 550, 561 of 826). She was diagnosed with Major Depressive Disorder, recurrent and assessed a GAF score of 50[9] (Docket No. 10, p. 548 of 826).

###    3.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On May 26, 2009, Plaintiff underwent a Mental Residual Functional Capacity Assessment with state examiner Dr. Kevin Edwards, Ph.D. ("Dr. Edwards") (Docket No. 10, pp. 598-601 of 826). Dr.

_____

[8] A GAF score of 52 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, 34.

[9] A GAF score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV, 34.

Edwards found Plaintiff to be moderately limited in several categories, including her ability to:
(1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain
attention and concentration for extended periods; (4) perform activities within a schedule, maintain
regular attendance, and be punctual within customary tolerances; (5) complete a normal workday and
workweek without interruptions from psychologically based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods; (6) interact appropriately with the
general public; and (7) respond appropriately to changes in the work setting (Docket No. 10, pp. 598-
99 of 826).

### 4.    PSYCHIATRIC REVIEW TECHNIQUE

On the same day, Dr. Edwards also completed a Psychiatric Review Technique for Plaintiff
(Docket No. 10, pp. 602-15 of 826). Dr. Edwards noted that Plaintiff suffered from Major Depressive
Disorder (Docket No. 10, p. 605 of 826). In assessing "Paragraph B" criteria,[10] Dr. Edwards found
Plaintiff to have a mild degree of limitation with regard to her activities of daily living and moderate
difficulty in maintaining social functioning as well as concentration, persistence, and pace (Docket No.
10, p. 612 of 826). Dr. Edwards found no episodes of decompensation (Docket No. 10, p. 612 of 826).
Dr. Edwards did not find the presence of any "Paragraph C" criteria[11] (Docket No. 10, p. 613 of 826).

### 5.    PSYCHOLOGICAL EVALUATION

On June 18, 2009, Plaintiff underwent a second Psychological Evaluation at the Nord Center
(Docket No. 10, pp. 565-67, 643-45 of 826). Plaintiff reported still being homeless but also stated that

---

[10] Paragraph B criteria "describe impairment-related functional limitations that are incompatible
with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.00(A).

[11] Paragraph C criteria also "describe impairment-related functional limitations that are
incompatible with the ability to do any gainful activity." 20 C.F.R. § 404, Subpart P, Appendix 1, §
12.00(A).

she was working with Children's Services to regain custody of her two children (Docket No. 10, pp.

566, 644 of 826). Plaintiff was neatly groomed and dressed and made good eye contact (Docket No.

10, pp. 567, 645 of 826). She had a limited amount of knowledge and spoke in generalities (Docket

No. 10, pp. 567, 645 of 826). Plaintiff was diagnosed with Major Depressive Disorder and assessed a

GAF score of 50[12] (Docket No. 10, pp. 567, 645 of 826).

### 6.   PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff underwent a Physical Residual Functional Capacity Assessment with state examiner

Dr. Cindi Hill, MD ("Dr. Hill") on August 21, 2009 (Docket No. 10, pp. 616-23 of 826). Dr. Hill

determined that Plaintiff had no exertional, manipulative, visual, or communicative limitations (Docket

No. 10, pp. 617-20 of 826). Dr. Hill opined that Plaintiff should only occasionally balance and should

never climb ladders, ropes, or scaffolds (Docket No. 10, p. 618 of 826). Dr. Hill also recommended

that Plaintiff avoid all hazards such as machinery and heights (Docket No. 10, p. 620 of 826).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are

identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v.*

*Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a

"disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same

---

[12] A GAF score of 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV, 34.

definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant is not disabled.

17

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform. *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)). A dispositive finding by the Commissioner at any point in the five-step process terminates the review. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Dixon made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2012.

2. Plaintiff has not engaged in substantial gainful activity since January 2, 2008, the alleged onset date.

3. Plaintiff has the following severe impairments: curvature of the spine and affective disorder.

6. Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

7. Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following limitations: (1) Plaintiff cannot climb ladders, ropes, or scaffolds but can frequently climb ramps and stairs; (2) Plaintiff must avoid all exposure to hazards such as machinery and heights; (3) Plaintiff retains the ability to understand, remember, and follow multi-step instructions; (4) Plaintiff is able to attend to and persist to complete simple, repetitive tasks of a stable nature with no strict production demands (timed, counted, precision); and (5) Plaintiff is able to relate well to individuals but would do best in an environment with no groups for intense or prolonged periods.

8. Plaintiff is capable of performing past relevant work as a housekeeper/cleaner and stocker. This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

9.      Plaintiff has not been under a disability, as defined in the Social Security Act, from January 2, 2008, through the date of this decision.

(Docket No. 10, pp. 18-26 of 826). ALJ Dixon denied Plaintiff's request for DIB and SSI benefits (Docket No. 10, p. 26 of 826).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

## A.      PLAINTIFF'S ALLEGATIONS

In her Brief on the Merits, Plaintiff alleges that the ALJ failed to follow the treating physician rule by not assigning controlling weight to the opinion of Plaintiff's treating physician, Dr. Patel (Docket No. 14, p. 12 of 16).

**B.    DEFENDANT'S RESPONSE**

Defendant disagrees and argues that the ALJ did not have to assign Dr. Patel's opinion controlling weight because the opinion was inconsistent with the balance of the objective medical evidence (Docket No. 15, p. 10 of 15).

**C.    DISCUSSION**

**1.    TREATING PHYSICIAN RULE**

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

20

> [T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). Here, ALJ Dixon does not even mention the opinion of Plaintiff's alleged treating physician, Dr. Patel, in his decision (Docket No. 10, pp. 18-26 of 826). The Appeals Council mentions Dr. Patel's opinion only briefly, stating

> [t]he Council concludes that the longitudinal record does not support finding headaches to be a severe impairment as the evidence reflects intermittent medication treatment related to headaches and neurological and cardiac testing has not revealed an underlying vasculitis or other significant disorder. In so finding, the Council considered the statement and opinion of treating source Dhruv R. Patel, M.D. dated August 16, 2011, but finds that the medical opinion is on an issue reserved to the Commissioner, and is not supported by objective clinical findings.

(Docket No. 10, p. 9 of 826).[13] Plaintiff claims that Dr. Patel is her treating physician (Docket No. 14, p. 12 of 16). While Defendant does not disagree with Plaintiff on this issue, it does argue that Dr. Patel's opinion is not entitled to controlling weight (Docket No. 15, p. 10 of 15). ALJ Dixon's failure to include Dr. Patel's opinion and findings in his decision suggests that the ALJ does not consider Dr. Patel to be a treating physician. This Magistrate agrees.

Before according any weight to the opinions of a claimant's physicians, the ALJ must first determine which of a claimant's physicians, if any, are to be considered "treating sources." "A physician is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation that is typical for the treated conditions."

---

[13] It should be noted that ALJ Dixon did not have the opportunity to review Dr. Patel's notes from Plaintiff's August 16, 2011, visit, as the ALJ rendered his opinion on May 12, 2011.

*Blakley*, 581 F.3d at 407 (*quoting* 20 C.F.R. § 404.1502) (internal quotations omitted)). Plaintiff alleges that she and Dr. Patel "have a strong treatment relationship," and that Dr. Patel treated Plaintiff "for several years . . . examined her in person, ordered testing on her behalf, and prescribed treatment when needed" (Docket No. 14, p. 13 of 16). Although Dr. Patel did examine Plaintiff on two occasions, June 29, 2007, and June 27, 2010 (Docket No. 10, pp. 255-56, 816-18 of 826), there is no evidence to suggest that Dr. Patel was Plaintiff's treating physician.

Notes from his June 29, 2007, visit indicate that Dr. Patel was brought in only as a consultant during Plaintiff's hospital stay (Docket No. 10, pp. 256 of 826). In fact, Dr. Patel indicated that Plaintiff "was seen by Dr. Mahajan in the office. She has not followed up in the office for the last couple of year's time" (Docket No. 10, p. 255 of 826).[14] The next time Plaintiff saw Dr. Patel was *three* years later, on July 27, 2010 (Docket No. 10, p. 816 of 826). There is absolutely no evidence in the record that Plaintiff saw Dr. Patel at any point during these three years. Two visits is simply not evidence of a "strong treatment relationship" or treatment that spanned "several years" (Docket No. 10, pp. 245-826 of 826).

Based upon Plaintiff's limited interaction with Dr. Patel, this Magistrate finds Plaintiff's assignment of error to be without merit. Dr. Patel is not one of Plaintiff's treating physicians, as that term is defined by Social Security regulations. Therefore, his opinion is not entitled to controlling weight.

Even if Dr. Patel were Plaintiff's treating physician, his opinion is still not entitled to controlling weight. Plaintiff alleges that Dr. Patel found her "medically unable to work" (Docket No. 14, p. 13 of 16). Although Dr. Patel did make this statement in his August 16, 2011, letter to Plaintiff's

---

[14] Dr. Patel and Dr. Mahajan are based out of the same practice (Docket No. 10, p. 289 of 826).

then attorney, a determination of disability is strictly a legal, not a medical, issue, and is reserved solely to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, Dr. Patel's opinion as to whether Plaintiff can or cannot work is not relevant, and certainly not conclusive evidence, to a determination of Plaintiff's limitations.

Furthermore, Dr. Patel's opinion does not align with the balance of Plaintiff's medical record. In fact, his August 2011 conclusion stands in direct opposition to his July 27, 2010, observation (Docket No. 10, pp. 816-18, 826 of 826). Plaintiff's July 2010 medical records state Plaintiff "does have some minor risk factors for cerebrovascular disease, though she *does not* have cerebrovascular disease itself" (Docket No. 10, p. 818 of 826) (emphasis added). Dr. Patel's 2011 letter, made more than one year after his last visit with Plaintiff states Plaintiff's "evaluation has revealed bilateral frontal cerebrovascular disease" (Docket No. 10, p. 826 of 826). There is no evidence as to why Dr. Patel changed his mind regarding Plaintiff's diagnosis.

Plaintiff takes issue with the fact that neither the ALJ nor the Appeals Council included headaches as one of her severe impairments (Docket No. 14, p. 13 of 16). Plaintiff was, in fact, diagnosed with a PFO in May 2008 (Docket No. 10, pp. 366, 482 of 826) and continued to have headaches thereafter. However, during Plaintiff's first hospital admission in early February 2009, she admitted to not following her aspirin or Depakote routine (Docket No. 10, p. 255 of 826). At that time, hospital staff diagnosed her with tension headaches (Docket No. 10, pp. 256, 268 of 826). During Plaintiff's second hospitalization due to her headaches, Plaintiff was *again* diagnosed with tension muscular headaches and *again* admitted to not following her prescribed medication regimen (Docket No. 10, pp. 789-90 of 826). According to Social Security regulations, a claimant cannot be considered disabled when he or she fails to follow prescribed medical treatment without good reason. 20 C.F.R. §

416.930(b). Nothing in Plaintiff's medical record, aside from Plaintiff's own subjective testimony, indicates that Plaintiff's headaches would be debilitating to the point of disability assuming Plaintiff takes her medication as prescribed (Docket No. 10, pp. 245-826 of 826).

Furthermore, Dr. Hill determined, after a review of Plaintiff's entire medical record, that Plaintiff had very few physical limitations (Docket No. 10, pp. 616-23 of 826). The limitations that Dr. Hill *did* find were incorporated into both the ALJ's and the Appeals Council's residual functional capacity assessment (Docket No. 10, pp. 8-11, 18-26 of 826). Given the discrepancy between Dr. Patel's opinion and the balance of Plaintiff's medical record, this Magistrate finds that Dr. Patel's opinion is not entitled to controlling weight. Plaintiff's assignment of error is therefore without merit and the Magistrate recommends that the decision of the Commissioner be affirmed.

## VIII.  CONCLUSION

For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   March 5, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto

has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.

25